ASJZ/7.14.2022

U.S. Department of Justice

United States Attorney
District of Maryland
Southern Division

Coreen Mao
Assistant United States Attorney
Coreen.Mao@usdoj.gov

Mailing Address:
6500 Cherrywood Lane, Suite 200
Greenbelt, MD 20770-1249

Office Location:
6406 Ivy Lane, 8th Floor
Greenbelt, MD 20770-1249

DIRECT: 301-344-0112
MAIN: 301-344-4433
FAX: 301-344-4516

July 26, 2022

David Walsh-Little, Esq.
The Law Office of David Walsh-Little, LLC
1014 West 36th Street
Baltimore, MD 21211

Re:   United States v. Ryan Farace,
      Criminal No. CCB-21-294

Dear Counsel:

This letter, together with the Sealed Supplement, confirms the plea agreement (this "Agreement") that has been offered to your client, Ryan Farace (hereinafter "the Defendant"), by the United States Attorney's Office for the District of Maryland ("this Office"). If the Defendant accepts this offer, please have the Defendant execute it in the spaces provided below. If this offer has not been accepted by **5:00 p.m. on August 9, 2022**, it will be deemed withdrawn. The terms of the Agreement are as follows:

### Offense of Conviction

1.   The Defendant agrees to plead guilty to Count One of the Indictment, which charges the Defendant with Conspiracy to Commit Money Laundering, in violation of 18 U.S.C. § 1956(h). The Defendant admits that the Defendant is, in fact, guilty of the offense and will so advise the Court.

### Elements of the Offense

2.   The elements of the offense to which the Defendant has agreed to plead guilty, and which this Office would prove if the case went to trial, are as follows: That on or about the time alleged in the Indictment, in the District of Maryland: (1) the Defendant and at least one other person entered into the unlawful agreement charged in the Indictment, that is, an agreement to commit one or more of the substantive money laundering offenses described under 18 U.S.C. § 1956; (2) the Defendant knew that the money laundering proceeds had been derived from an illegal activity; and (3) the Defendant knowingly and willfully became a member of that conspiracy.

Penalties

3. The maximum penalties provided by statute for the offense to which the Defendant is pleading guilty are as follows:

| Count | Statute | Minimum Prison | Maximum Prison | Supervised Release | Maximum Fine | Special Assessment |
|---|---|---|---|---|---|---|
| 1 | 18 U.S.C. § 1956(h) | N/A | 20 years | 3 years | $500,000 (or twice the value of the property involved in the money laundering) | $100 |

    a. Prison: If the Court orders a term of imprisonment, the Bureau of Prisons has sole discretion to designate the institution at which it will be served.

    b. Supervised Release: If the Court orders a term of supervised release, and the Defendant violates the conditions of supervised release, the Court may order the Defendant returned to custody to serve a term of imprisonment as permitted by statute, followed by an additional term of supervised release.

    c. Restitution: The Court may order the Defendant to pay restitution pursuant to 18 U.S.C. §§ 3663, 3663A, and 3664.

    d. Payment: If a fine or restitution is imposed, it shall be payable immediately, unless the Court orders otherwise under 18 U.S.C. § 3572(d). The Defendant may be required to pay interest if the fine is not paid when due.

    e. Forfeiture: The Court may enter an order of forfeiture of assets directly traceable to the offense, substitute assets, and/or a money judgment equal to the value of the property subject to forfeiture.

    f. Collection of Debts: If the Court imposes a fine or restitution, this Office's Financial Litigation Unit will be responsible for collecting the debt. If the Court establishes a schedule of payments, the Defendant agrees that: (1) the full amount of the fine or restitution is nonetheless due and owing immediately; (2) the schedule of payments is merely a minimum schedule of payments and not the only method, nor a limitation on the methods, available to the United States to enforce the judgment; and (3) the United States may fully employ all powers to collect on the total amount of the debt as provided by law. Until the debt is paid, the Defendant agrees to disclose all assets in which the Defendant has any interest or over which the Defendant exercises direct or indirect control. Until the money judgment is satisfied, the Defendant authorizes this Office to obtain a credit report in order to evaluate the Defendant's ability to pay, and to request and review the Defendant's federal and state income tax returns. The Defendant

agrees to complete and sign a copy of IRS Form 8821 (relating to the voluntary disclosure of federal tax return information) and a financial statement in a form provided by this Office.

### Waiver of Rights

4. The Defendant understands that by entering into this Agreement, the Defendant surrenders certain rights as outlined below:

   a. If the Defendant had pled not guilty and persisted in that plea, the Defendant would have had the right to a speedy jury trial with the close assistance of competent counsel. That trial could be conducted by a judge, without a jury, if the Defendant, this Office, and the Court all agreed.

   b. If the Defendant elected a jury trial, the jury would be composed of twelve individuals selected from the community. Counsel and the Defendant would have the opportunity to challenge prospective jurors who demonstrated bias or who were otherwise unqualified, and would have the opportunity to strike a certain number of jurors peremptorily. All twelve jurors would have to agree unanimously before the Defendant could be found guilty of any count. The jury would be instructed that the Defendant was presumed to be innocent, and that presumption could be overcome only by proof beyond a reasonable doubt.

   c. If the Defendant went to trial, the Government would have the burden of proving the Defendant guilty beyond a reasonable doubt. The Defendant would have the right to confront and cross-examine the Government's witnesses. The Defendant would not have to present any defense witnesses or evidence whatsoever. If the Defendant wanted to call witnesses in defense, however, the Defendant would have the subpoena power of the Court to compel the witnesses to attend.

   d. The Defendant would have the right to testify in the Defendant's own defense if the Defendant so chose, and the Defendant would have the right to refuse to testify. If the Defendant chose not to testify, the Court could instruct the jury that they could not draw any adverse inference from the Defendant's decision not to testify.

   e. If the Defendant were found guilty after a trial, the Defendant would have the right to appeal the verdict and the Court's pretrial and trial decisions on the admissibility of evidence to see if any errors were committed which would require a new trial or dismissal of the charges. By pleading guilty, the Defendant knowingly gives up the right to appeal the verdict and the Court's decisions.

   f. By pleading guilty, the Defendant will be giving up all of these rights, except the right, under the limited circumstances set forth in the "Waiver of Appeal" paragraph below, to appeal the sentence. By pleading guilty, the Defendant understands that the Defendant may have to answer the Court's questions both about the rights being given up and about the facts of the case. Any statements that the Defendant makes during such a hearing would not be admissible against the Defendant during a trial except in a criminal proceeding for perjury or false statement.

    g. If the Court accepts the Defendant's plea of guilty, the Defendant will be giving up the right to file and have the Court rule on pretrial motions, and there will be no further trial or proceeding of any kind in the above-referenced criminal case, and the Court will find the Defendant guilty.

    h. By pleading guilty, the Defendant will also be giving up certain valuable civil rights and may be subject to deportation or other loss of immigration status, including possible denaturalization. The Defendant recognizes that if the Defendant is not a citizen of the United States, or is a naturalized citizen, pleading guilty may have consequences with respect to the Defendant's immigration status. Under federal law, conviction for a broad range of crimes can lead to adverse immigration consequences, including automatic removal from the United States. Removal and other immigration consequences are the subject of a separate proceeding, however, and the Defendant understands that no one, including the Defendant's attorney or the Court, can predict with certainty the effect of a conviction on immigration status. The Defendant is not relying on any promise or belief about the immigration consequences of pleading guilty. The Defendant nevertheless affirms that the Defendant wants to plead guilty regardless of any potential immigration consequences.

Advisory Sentencing Guidelines Apply

  5. The Defendant understands that the Court will determine a sentencing guidelines range for this case (henceforth the "advisory guidelines range") pursuant to the Sentencing Reform Act of 1984 at 18 U.S.C. § 3551-3742 (excepting 18 U.S.C. § 3553(b)(1) and 3742(e)) and 28 U.S.C. §§ 991 through 998. The Defendant further understands that the Court will impose a sentence pursuant to the Sentencing Reform Act, as excised, and must take into account the advisory guidelines range in establishing a reasonable sentence.

Factual and Advisory Guidelines Stipulation

  6. This Office and the Defendant stipulate and agree to the Statement of Facts set forth in Attachment A, which is incorporated by reference herein.

    a. This Office and the Defendant further agree that the applicable base offense level pursuant to U.S.S.G. § 2S1.1(a)(2) is determined by reference to the guidelines for narcotics offenses because the Defendant is responsible for the underlying crime. Pursuant to U.S.S.G. §§ 2D1.1(a)(5) and (c)(14), the base offense level is **12** because the Defendant manufactured, distributed, and possessed with the intent to distribute 80,000 or more units of a Schedule IV narcotic.

    b. The offense level is increased by **2** levels pursuant to § 2D1.1(b)(7) because the Defendant distributed a controlled substance through mass marketing by means of an interactive computer service.

    c. The offense level is increased by **2** levels pursuant § 2D1.1(b)(12) because the Defendant maintained a premises for the purpose of manufacturing and distributing a controlled substance.

        d.        The offense level is increased by **2** levels pursuant to § 2S1.1(b)(2)(B) because the Defendant will be convicted under 18 U.S.C. § 1956.

        e.        The offense level is increased by **2** levels pursuant to § 2S1.1(b)(3) because the offense involved sophisticated laundering.

        f.        The offense level is increased by **2** levels pursuant to § 3B1.1(c) because the Defendant was the organizer of the offense with respect to his father, Joseph Farace.

        g.        The offense level is increased by **2** levels pursuant to § 3C1.1 because the Defendant obstructed justice by committing the crime while knowing the funds he attempted and conspired to launder were the subject of an order of forfeiture entered against him as part of his sentence imposed in 2018 in connection with *United States v. Ryan Farace*, CCB-18-0018.

        h.        This Office does not oppose a **2**-level reduction in the Defendant's adjusted offense level pursuant to U.S.S.G. § 3E1.1(a) based upon the Defendant's apparent prompt recognition and affirmative acceptance of personal responsibility for the Defendant's criminal conduct. This Office agrees to make a motion pursuant to U.S.S.G. § 3E1.1(b) for an additional **1**-level decrease in recognition of the Defendant's timely notification of the Defendant's intention to enter a plea of guilty. This Office may oppose any adjustment for acceptance of responsibility under U.S.S.G. § 3E1.1(a), and may decline to make a motion pursuant to U.S.S.G. § 3E1.1(b), if the Defendant: (i) fails to admit each and every item in the factual stipulation; (ii) denies involvement in the offense; (iii) gives conflicting statements about the Defendant's involvement in the offense; (iv) is untruthful with the Court, this Office, or the United States Probation Office; (v) obstructs or attempts to obstruct justice prior to sentencing; (vi) engages in any criminal conduct between the date of this Agreement and the date of sentencing; (vii) attempts to withdraw the plea of guilty; or (viii) violates this Agreement in any way.

7.        There is no agreement as to the Defendant's criminal history and the Defendant understands that the Defendant's criminal history could alter the Defendant's offense level. Specifically, the Defendant understands that the Defendant's criminal history could alter the final offense level if the Defendant is determined to be a career offender or if the instant offense was a part of a pattern of criminal conduct from which the Defendant derived a substantial portion of the Defendant's income.

8.        Other than as set forth above, no other offense characteristics, sentencing guidelines factors, potential departures or adjustments set forth in the United States Sentencing Guidelines are in dispute or will be raised in calculating the advisory guidelines range.

## Obligations of the Parties

9.        At the time of sentencing, this Office and the Defendant reserve the right to advocate for a reasonable sentence, period of supervised release, and/or fine considering any appropriate factors under 18 U.S.C. § 3553(a). This Office and the Defendant reserve the right to bring to the Court's attention all information with respect to the Defendant's background, character, and conduct that this Office or the Defendant deem relevant to sentencing, including the

conduct that is the subject of any counts of the Indictment. At the time of sentencing, this Office will move to dismiss any open counts against the Defendant.

Forfeiture

10. The Defendant understands that the Court may enter an Order of Forfeiture as part of the Defendant's sentence, and that the Order of Forfeiture may include assets directly traceable to the offenses, substitute assets, and/or a money judgment equal to the value of the property derived from, or otherwise involved in, the offenses.

11. Specifically, but without limitation on the Government's right to forfeit all property subject to forfeiture as permitted by law, the Defendant agrees to forfeit to the United States all of the Defendant's right, title, and interest in the following items that the Defendant agrees constitute money, property, and/or assets derived from or obtained by the Defendant as a result of, used to facilitate the commission of, or involved in, the Defendant's illegal activities:

    a.    2,874.904256 bitcoin seized on or about February 10, 2021; and

    b.    58.742155166 bitcoin seized on or about May 11, 2021.

The Defendant also agrees to consent to the Government's filing of a motion to forfeit all right, title and interest in the following subsequently located property in Criminal No. CCB-18-0018 which the Defendant admits were derived from or obtained by the Defendant as a result of the offenses of conviction in the 2018 criminal case and/or were involved in his 2018 money laundering offense of conviction:

    a.    22.30267654 bitcoin recovered on or about January 7, 2020; and

    b.    2.00601444 bitcoin recovered on or about March 11, 2020.

12. The Defendant agrees to consent to the entry of orders of forfeiture for the property described herein and waives the requirements of Federal Rules of Criminal Procedure 32.2 and 43(a) regarding notice of the forfeiture in the charging instrument, announcement of the forfeiture at sentencing, and incorporation of the forfeiture in the judgment.

13. The Defendant agrees to assist fully in the forfeiture of the above property. The Defendant agrees to disclose all assets and sources of income, to consent to all requests for access to information related to assets and income, and to take all steps necessary to pass clear title to the forfeited assets to the United States, including executing all documents necessary to transfer such title, assisting in bringing any assets located outside of the United States within the jurisdiction of the United States, and taking whatever steps are necessary to ensure that assets subject to forfeiture are made available for forfeiture.

14. The Defendant waives all challenges to any forfeiture carried out in accordance with this Agreement on any grounds, including any and all constitutional, legal, equitable, statutory, or administrative grounds brought by any means, including through direct appeal, habeas corpus petition, or civil complaint. The Defendant will not challenge or seek review of any civil

or administrative forfeiture of any property subject to forfeiture under this Agreement, and will not assist any third party with any challenge or review or any petition for remission of forfeiture.

### Waiver of Appeal

15. In exchange for the concessions made by this Office and the Defendant in this Agreement, this Office and the Defendant waive their rights to appeal as follows:

a. The Defendant knowingly waives all right, pursuant to 28 U.S.C. § 1291 or any other statute or constitutional provision, to appeal the Defendant's conviction on any ground whatsoever. This includes a waiver of all right to appeal the Defendant's conviction on the ground that the statute to which the Defendant is pleading guilty is unconstitutional, or on the ground that the admitted conduct does not fall within the scope of the statute, to the extent that such challenges legally can be waived.

b. The Defendant and this Office knowingly and expressly waive all rights conferred by 18 U.S.C. § 3742 to appeal whatever sentence is imposed (including any term of imprisonment, fine, term of supervised release, or order of restitution) for any reason (including the establishment of the advisory sentencing guidelines range, the determination of the Defendant's criminal history, the weighing of the sentencing factors, and any constitutional challenges to the calculation and imposition of any term of imprisonment, fine, order of forfeiture, order of restitution, and term or condition of supervised release), except as follows:

i. The Defendant reserves the right to appeal any term of imprisonment to the extent that it exceeds any sentence within the advisory guidelines range resulting from an offense level of **21**; and

ii. This Office reserves the right to appeal any term of imprisonment to the extent that it is below any sentence within the advisory guidelines range resulting from an offense level of **21**.

c. The Defendant waives any and all rights under the Freedom of Information Act relating to the investigation and prosecution of the above-captioned matter and agrees not to file any request for documents from this Office or any investigating agency.

### Defendant's Conduct Prior to Sentencing and Breach

16. Between now and the date of the sentencing, the Defendant will not engage in conduct that constitutes obstruction of justice under U.S.S.G. § 3C1.1; will not violate any federal, state, or local law; will acknowledge guilt to the probation officer and the Court; will be truthful in any statement to the Court, this Office, law enforcement agents, and probation officers; will cooperate in the preparation of the presentence report; and will not move to withdraw from the plea of guilty or from this Agreement.

17. If the Defendant engages in conduct prior to sentencing that violates the above paragraph of this Agreement, and the Court finds a violation by a preponderance of the evidence,

then: (i) this Office will be free from its obligations under this Agreement; (ii) this Office may make sentencing arguments and recommendations different from those set out in this Agreement, even if the Agreement was reached pursuant to Rule 11(c)(1)(C); and (iii) in any criminal or civil proceeding, this Office will be free to use against the Defendant all statements made by the Defendant and any of the information or materials provided by the Defendant, including statements, information, and materials provided pursuant to this Agreement, and statements made during proceedings before the Court pursuant to Rule 11 of the Federal Rules of Criminal Procedure. A determination that this Office is released from its obligations under this Agreement will not permit the Defendant to withdraw the guilty plea. The Defendant acknowledges that the Defendant may not withdraw the Defendant's guilty plea—even if made pursuant to Rule 11(c)(1)(C)—if the Court finds that the Defendant breached the Agreement. In that event, neither the Court nor the Government will be bound by the specific sentence or sentencing range agreed and stipulated to herein pursuant to Rule 11(c)(1)(C).

## Court Not a Party

18. The Court is not a party to this Agreement. The sentence to be imposed is within the sole discretion of the Court. The Court is not bound by the Sentencing Guidelines stipulation in this Agreement. The Court will determine the facts relevant to sentencing. The Court is not required to accept any recommendation or stipulation of the parties. The Court has the power to impose a sentence up to the maximum penalty allowed by law. If the Court makes sentencing findings different from those stipulated in this Agreement, or if the Court imposes any sentence up to the maximum allowed by statute, the Defendant will remain bound to fulfill all of the obligations under this Agreement. Neither the prosecutor, defense counsel, nor the Court can make a binding prediction, promise, or representation as to what guidelines range or sentence the Defendant will receive. The Defendant agrees that no one has made such a binding prediction or promise.

## Entire Agreement

19. This letter, together with the Sealed Supplement, constitutes the complete plea agreement in this case. This letter, together with the Sealed Supplement, supersedes any prior understandings, promises, or conditions between this Office and the Defendant. There are no other agreements, promises, undertakings, or understandings between the Defendant and this Office other than those set forth in this letter and the Sealed Supplement. No changes to this Agreement will be effective unless in writing, signed by all parties and approved by the Court.

If the Defendant fully accepts each and every term and condition of this Agreement, please sign and have the Defendant sign the original and return it to me promptly.

Very truly yours,

Erek L. Barron
United States Attorney

_____
Coreen Mao
Assistant United States Attorney

-and-

Deborah Connor
Chief
Money Laundering and Asset Recovery Section
Criminal Division

_____
Emily Cohen
Trial Attorney

08-12-22
Date

_____
Ryan Farace

I have read this Agreement, including the Sealed Supplement, and carefully reviewed every part of it with my attorney. I understand it and I voluntarily agree to it. Specifically, I have reviewed the Factual and Advisory Guidelines Stipulation with my attorney and I do not wish to change any part of it. I am completely satisfied with the representation of my attorney.

I am the Defendant's attorney. I have carefully reviewed every part of this Agreement, including the Sealed Supplement with the Defendant. The Defendant advises me that the Defendant understands and accepts its terms. To my knowledge, the Defendant's decision to enter into this Agreement is an informed and voluntary one.

8-12-22
Date

_____
David Walsh-Little, Esq.

## ATTACHMENT A

### STIPULATION OF FACTS

*The undersigned parties stipulate and agree that if this case had proceeded to trial, this Office would have proven the following facts beyond a reasonable doubt. The undersigned parties also stipulate and agree that the following facts do not encompass all of the evidence that would have been presented had this matter proceeded to trial.*

At all relevant times, defendant **RYAN FARACE** ("**R. FARACE**") was incarcerated at a federal correctional institution located outside of Maryland and **R. FARACE's** father, **JOSEPH FARACE** ("**J. FARACE**"), was a resident of Sparks, Maryland. **R. FARACE** was incarcerated because in November 2018, **R. FARACE** was convicted of one count of conspiracy to manufacture, distribute, and possess with the intent to distribute alprazolam, a Schedule IV controlled substance, in violation of the Controlled Substances Act, 21 U.S.C § 846, and one count of conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h) (the "2018 Crimes").

In the Statement of Facts submitted in support of **R. FARACE's** plea agreement for the 2018 Crimes, **R. FARACE** admitted, among other things, that:

  a. From at least November 2013 until at least June 2017, **R. FARACE** solicited orders for his alprazolam pills using the vendor name "XANAXMAN" on various darknet marketplaces, including but not limited to Silk Road 2.0, Hansa, and Dark Heroes League.

  b. The Hansa darknet marketplace was seized by Dutch authorities in or about June 2017. At that time, law enforcement obtained information about Hansa's buyers and sellers. This data reflects that between May 2016 and March 2017 the Hansa vendor, "XANAXMAN" shipped 629 orders totaling approximately 500,000 pills, for which he received about 194 bitcoins. Although most of XANAXMAN's customers provided XANAXMAN with their shipping addresses via encrypted messages that law enforcement officers cannot decode, on six occasions "XANAXMAN's" customers failed to do so. For each of these six "XANAXMAN" customers, on or about the same date that "XANAXMAN" confirmed on Hansa that the orders of alprazolam had been shipped, the transaction data for postal meter #1013017 indicates a package was shipped to the address provided by the Hansa customer.

  c. Blockchain analysis and other cryptocurrency tracing techniques establish that, in all, wallets associated with **R. FARACE** and/or "XANAXMAN" received over 9,138 bitcoins from addresses associated with darknet marketplaces. **R. FARACE** also confirmed in encrypted emails that he had "4000 plus bitcoin built up" and that

10

        he "[n]ever really traded" Bitcoin and has "zero experience making money trading btc[1]."

    d. For the duration of the drug distribution conspiracy, **R. FARACE** had no appreciable source of lawfully earned income

Prior to his sentencing for the 2018 Crimes, in November 2018, **R. FARACE** met with representatives from the U.S. Attorney's Office for the District of Maryland and the Drug Enforcement Administration. The purpose of the meeting, which was conducted pursuant to a proffer letter, was for **R. FARACE** to help the government gain access to **R. FARACE's** drug proceeds—particularly cryptocurrency and cash—which had not yet been seized. During the meeting, **R. FARACE** repeatedly stated that he did not remember the location or means by which he could access any additional bitcoins abut which the government was not already aware.[2] At sentencing, **R. FARACE** argued he had been cooperative with the government's efforts to obtain his assets and that, consequently, he should receive a more favorable sentence.

Notwithstanding his representations to the government, from at least October 2019 and continuing through in or about April 2021, in the District of Maryland and elsewhere, the Defendant, **R. FARACE**, knowingly combined, conspired, confederated, and agreed with his dad, **J. FARACE**, and others to conduct financial transactions which involved the proceeds of a specified unlawful activity—to wit, conspiracy to manufacture, distribute, and possess with the intent to distribute alprazolam, a Schedule IV controlled substance, in violation of 21 U.S.C. § 846—while knowing that the property involved in the financial transactions represented the proceeds of some form of unlawful activity and that the transaction was and to conceal or disguise the nature, location, source, ownership, or control of the proceeds of the specified unlawful activity.

For example, in 2019, **R. FARACE** sent approximately 71 BTC from digital wallets he controlled to online exchanges and retailers, among other places.[3] Records from one such retailer, eGifter.com, reflect that **R. FARACE** used some of these drug proceeds to purchase for the benefit of his family members, including **J. FARACE**, $3,341.65 worth of gift cards from Target,

---

[1] "BTC" is an abbreviation for "bitcoin."

[2] Subsequent to **R. FARACE's** sentencing on the 2018 Crimes, law enforcement was able to recover the following additional bitcoins: (a) on or about January 7, 2020 law enforcement recovered 22.30267654 bitcoin from a Bitpay account successfully recreated from a recovery seed found during execution of a search warrant at **R. FARACE's** residence on January 16, 2018; and (b) on or about March 11, 2020, law enforcement recovered 2.00601444 bitcoin through additional analysis of a computer recovered during execution of a search warrant at **R. FARACE's** parents' home in Sparks, Maryland on January 16, 2018. The subsequently located bitcoins constitute, or were derived form, proceeds obtained by **R. FARACE** as a result of the 2018 Crimes and were involved in **R. FARACE's** 2018 money laundering offense.

[3] On May 11, 2021, members of law enforcement seized pursuant to warrant 58.742155166 of these bitcoins, which remained at one of the online exchanges and were involved in the money laundering conspiracy described herein.

Amazon, Visa, and Google Play. **R. FARACE** used a contraband cell phone in the prison facility to communicate with **J. FARACE** about these purchases through an encrypted email service.

Later, in August 2020, **R. FARACE** and Individual 1 attended the same drug abuse treatment program at the Federal Correctional Institution Petersburg ("FCI Petersburg"). Over the next several weeks, in part due to Individual 1's notoriety for his role in a well-known cryptocurrency theft, **R. FARACE** and Individual 1 became friends and, ultimately, Individual 1 agreed to help **R. FARACE** launder his outstanding drug proceeds. As detailed below, **R. FARACE** asked his father, **J. FARACE** (who was not in jail) to perform the transfer of more than 2874 bitcoin to Individual 1's mother (who was likewise not in jail). To facilitate the unlawful transfers, **R. FARACE** typed the wallet address controlled by Individual 1's mother into the back cover of a prison library book, which **R. FARACE** then mailed to **J. FARACE** at the family home in Sparks, Maryland.

**R FARACE** and Individual 1 agreed that Individual 1, who was set to be released from prison in or about December 2020, would facilitate the laundering of **R. FARACE's** assets through a seller who would deposit cash from the sale of **R. FARACE's** bitcoin into a foreign bank account. **R. FARACE** provided Individual 1 with an inked fingerprint so that **R. FARACE** could later prove his identity and obtain access to the funds in the foreign account.

In all, at **R. FARACE's** direction, **J. FARACE** transferred to a wallet controlled by Individual 1's mother: (i) a single "test" bitcoin on September 5, 2020, (ii) a transfer of 1,372.11243184 bitcoins on September 7, 2020, and (iii) a transfer of 1,501.79176413 bitcoins on September 24, 2020. On February 10, 2021, federal agents seized all 2,874.90419597 bitcoin that **J. FARACE** had transferred to Individual 1, all of which constituted **R. FARACE's** direct or indirect proceeds from the 2018 Crimes and were involved in the instant money laundering offense.

**R. FARACE** and **J. FARACE** communicated about the transfers through email and telephone conversations[4] in which they referred to **R. FARACE's** hardware wallets (on which **R. FARACE's** bitcoin had been stored) as "e-readers" or "logbooks" and otherwise attempted to use coded language. **R. FARACE** and **J. FARACE** used such language to conceal their activities: because **R. FARACE** was in prison at the time of these communications, they were saved and recorded by, and accessible to, prison personnel and investigating agents. These communications nonetheless confirmed the **FARACES'** attempted money laundering activities. For example, from September 5 to September 7, 2020, when **J. FARACE** was first testing the bitcoin address provided to him (through **R. FARACE**) by Individual 1 by initiating the transfer of a single bitcoin, and later transferring over 1372 bitcoin, **R. FARACE** and **J. FARACE** engaged in the following email exchange:

| Date/Time | From | To | Subject | Relevant Message Portion |
|---|---|---|---|---|
| 9/5/2020 5:06PM | **J. FARACE** | **R. FARACE** | Done | It's all good. |

---

[4] Many of the emails **J. FARACE** sent to his son, **R. FARACE**, were sent from one of two IP addresses assigned to **J. FARACE's** home in Sparks, Maryland.

| 9/5/2020 5:07PM | R. FARACE | J. FARACE | Done | excellent thank you for taking the time to do that ill be in touch tomorrow thanks |
| --- | --- | --- | --- | --- |
| 9/5/2020 8:00PM | R. FARACE | J. FARACE | monthly expenses | Again if everything worked right from earlier then I will need u also to take care of the rest of that for me. We will talk more tomorrow. I love u dad thanks for everything. |
| 9/6/2020 1:53PM | R. FARACE | J. FARACE | I wantted [sic] to apologize | Please when you get home from work finish that project ASAP, Finish the whole project. Please inform me when your [sic] done with that project. . . Again if you get home at 7, the sooner the better, cause i have to lock in at 8-8:30 and it would be nice to get word that its [sic] finished. Again double check your work don't make any mistakes. I was informed you made no mistakes the first time. So take ur time do it right. |
| 9/6/2020 11:36PM | J. FARACE | R. FARACE | RE: READ THIS FIRST READ FIRST!!!! | Hey . . . the other r complete |
| 9/7/2020 11:02AM | R. FARACE | Associate 1 | RE: RE: [Associate 1]! | 7 months and 1 week to go starting tomorrow :) omg im so excited . . . You guys got no idea what I got planned too . . . Things couldn't have worked out better for me. . . I guess somebody really is lookin out for me, or all the good i done in this life has paid off or something |
| 9/7/2020 3:26PM | R. FARACE | J. FARACE | Request… | Pss. Also I got confirmation on the other thing was done correctly as well. Thank you. Just hang tight okay love u ryan |

Subsequent emails and recorded phone conversations reflect that **R. FARACE** thereafter asked **J. FARACE** to send a third transfer of bitcoins to Individual 1, which was completed on September 24, 2020.

Immediately prior to and following Individual 1's release from prison in or about December 2021, **R. FARACE** and **J. FARACE** discussed the assistance that Induvial 1 would provide. For example, during recorded jail conversations **R. FARACE** and **J. FARACE** discussed the following matters relating to Individual 1:

- December 7, 2020 – **R. FARACE** and **J. FARACE** discussed that a friend of **R. FARACE's** at the prison would soon be released to a halfway house. **J. FARACE** asked about a timeline for when the release would occur.

- December 12, 2020 – In two separate calls, **R FARACE** and **J. FARACE** discussed **R. FARACE's** friend at prison who is a computer hacker, and the friend's imminent release to a halfway house. **R. FARACE** asked **J. FARACE** what specific cell phone **J. FARACE** was then using.

- December 27, 2020 – **R. FARACE** called **J. FARACE** and said that **R. FARACE's** friend (i.e., Individual 1) would soon be contacting **J. FARACE**. **R. FARACE** sought to confirm **J. FARACE** was checking his emails, and **J. FARACE** confirmed that he (**J. FARACE**) constantly did so.

Separate from his proceeds hidden in the form of bitcoin, **R. FARACE** also sought Individual 1's help in digging up approximately $1 million cash that **R. FARACE** believed he had buried in his parents' back yard. **R. FARACE** provided Individual 1 with a hand-drawn map of his parents' home and indicated the area in which **R. FARACE** believed he had buried the cash. **R. FARACE** and **J. FARACE** likewise discussed through emails and phone calls the means by which they could obtain and protect—that is, launder—**R. FARACE's** drug proceeds that had already been converted to cash.

SO STIPULATED:

_____
Coreen Mao
Assistant United States Attorney
U.S. Attorney's Office for the District of Maryland

_____
Emily Cohen
Trial Attorney
Money Laundering & Asset Recovery Section
Criminal Division

_____
Ryan Farace
Defendant

_____
David Walsh-Little, Esq.
Counsel for Defendant

15